### ADAGIO INVESTMENT HOLDING LTD., et al., Plaintiffs,

v.

### FEDERAL DEPOSIT INSURANCE CORP. in its Corporate Capacity and as Receiver for the Connecticut Bank of Commerce, Defendants.

#### No. CIV.A. 02–2550(ESH).

United States District Court, District of Columbia.

Sept. 28, 2004.

Jami Lynn Wyatt, Stephen S. Kaye, Vanessa Alison, Yelvington Chandler, Bryan Cave LLP, Washington, DC, Kath-

leen M. Kundar, Fox Horan & Camerini LLP, Marshall Beil, Mcguirewoods LLP, Barry Robert Fischer, Sprour Fischer & Mandell LLP, New York, NY, for Plaintiffs.

John Allen Davidovich, Federal Deposit Insurance Corporation, Washington, DC, for Defendants.

Alan Leonard Spear, Federal Deposit Insurance Corporation, Washington, DC, for Defendants and Claimant.

Julian Karpoff, Karpoff & Title, Arlington, VA, for Plaintiffs and Defendants.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiffs allege that defendant FDIC, acting as receiver for a failed bank ("FDIC–R"), wrongfully reclassified millions of dollars by sweeping funds out of their insured accounts on the day that bank failed. The effect of this reclassification was to deny several plaintiffs full insurance payments from co-defendant FDIC, acting in its corporate capacity as insurer of deposit accounts ("FDIC–C"), and to withhold preferred status from plaintiffs' claims against the bank. Now before the Court are cross-motions for summary judgment, as well as defendants' motions to dismiss. Because the Court finds that the receiver exceeded its lawful authority, the Court grants plaintiffs' motions for summary judgment against FDIC–R and against FDIC–C with respect to the four plaintiffs still owed deposit insurance by FDIC–C.

## BACKGROUND

### I. Factual Background

On the afternoon of June 26, 2002, the Connecticut Bank of Commerce ("CBC") was closed by order of the Connecticut Superior Court, and the FDIC accepted appointment as the bank's receiver. Within hours, FDIC personnel arrived at each of CBC's branches, convened the bank staff, and informed them that the bank had been closed, directing them to close out the day's activities. After all pending transaction items had been processed, late that evening the bank's computers calculated the final balance in the customers' accounts. Thereafter, at the FDIC's direction, CBC Information Technology staff initiated a computer process that "swept" approximately \$20.2 million[1] from plaintiffs' insured DDA[2] accounts into uninsured International Banking Facility ("IBF") accounts.[3] Because both types of accounts existed at CBC, the sweep was strictly a bookkeeping transaction; no funds ever left the bank. Such sweeps were a nightly routine for CBC. But on the evening of the FDIC's appointment as CBC's receiver, the sweeps diverged in a critical manner from the norm: FDIC

---

1. As a result of a settlement concerning certain wire transfers, the parties agree that the amount that remains in dispute has been reduced to \$17,832,499.97.

2. A demand deposit account, or DDA, is a checking account or its equivalent. *See* 12 U.S.C. § 1813(*l*); 12 C.F.R. § 204.2(b)(1). As such, it is FDIC insured up to \$100,000. *See* 12 U.S.C. § 1821(a)(1); 12 C.F.R. § 330.11.

3. IBFs are established pursuant to Federal Reserve regulations; they may only contain international funds that do not directly affect domestic financial markets. *See* 12 C.F.R.

§ 204.8. IBFs were created in order to allow domestic banks to compete with their foreign counterparts, in part by creating a device—the IBF—whereby foreign depositors can earn interest on assets held by U.S. banks, which are otherwise barred from paying interest on commercial DDAs. 12 C.F.R. § 329.2. *See generally* International Banking Act of 1978, Pub.L. No. 95–369, 92 Stat. 607 (1978); *see also* James V. Haupt, International Activities of U.S. Banks and in U.S. Banking Markets, *Fed. Res. Bull.* 599, 600, 602 (Sept.1999).

staff directed CBC to manually override the computer program that routinely swept funds back a few hours later from the IBF accounts into the plaintiffs' DDA accounts. Therefore, when the FDIC made its deposit insurance calculations and categorized claims for the purpose of determining which funds would constitute preferred claims against the receivership, most of plaintiffs' assets, because of the FDIC-ordered "half-sweep," remained in the uninsured and non-preferred (Class 3) IBF accounts.[4] The net effect of the sweep was to eliminate any realistic prospect that plaintiffs would recover any part of the swept funds, which instead have accrued to the FDIC and other preferred claimants.[5]

## II. Procedural Background

The crux of this lawsuit hinges on whether the FDIC acted properly in reclassifying plaintiffs' insured and preferred DDA funds as uninsured and non-preferred IBF funds. Plaintiffs—twenty-five foreign bank or corporate account holders at CBC—have filed a six-count amended complaint against the FDIC in its corporate capacity, which insures bank deposits, and in its capacity as receiver of CBC. Cf. FDIC v. Ernst & Young LLP, 374 F.3d 579, 581 (7th Cir.2004) (describing the FDIC's different roles in each capacity). The parties have stipulated to the voluntary dismissal of two counts.[6] Of those that remain, Count I alleges that FDIC–R's sweep of plaintiffs' funds and its subsequent failure to issue preferred Class 2 receivership certificates, as well as FDIC–C's failure in four cases to pay full deposit insurance on plaintiffs' CBC assets, violated the Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. §§ 1811 et seq. Count II alleges that the FDIC in its dual capacities was unjustly enriched. Count III alleges that FDIC–R breached a fiduciary duty owed to plaintiffs. Finally, Count IV alleges that plaintiffs are entitled

---

4. The National Depositor Preference Act ("NDPA") establishes that creditors of a failed bank are to be paid, as relevant to this lawsuit, in the following order of priority: 1) Class 1 claims consist of the receiver's administrative expenses, 12 U.S.C. § 1821(d)(11)(A)(i); 2) Class 2 claims are the failed institution's deposit liabilities, id. § 1821(d)(11)(A)(ii), which include DDAs; and 3) Class 3 claims are general liabilities of the bank, id. § 1821(d)(11)(A)(iii), including IBFs. In many cases, Class 1 and 2 claims exhaust the liquidation assets, leaving no funds to pay Class 3 claims. So it is in the case of CBC. To date, Class 2 claims have received 61 cents on the dollar, whereas Class 3 claims against CBC have thus far received nothing, and the FDIC acknowledges that they are very unlikely to be paid. Nonetheless, it is well established that payment through delivery of a receivership certificate, even one that never has any cash value, is all that is required to fully compensate creditors. See, e.g., Resolution Trust Corp. v. Titan Financial Corp., 36 F.3d 891, 892–93 (9th Cir. 1994) (per curiam). That, of course, does not settle the question of whether plaintiffs were

issued the proper class of receivership certificate.

5. Plaintiffs have, however, received federal deposit insurance and Class 2 receivership certificates for those funds that were not swept from their DDA accounts. Every night when sweeps occurred, some funds were left in plaintiffs' DDA accounts pursuant to standing instructions. The amount of each day's sweep varied depending on that day's DDA balance. (Pls.' LCvR 56.1 Stmt., Ex. B at 2 (June 30, 2002 Mem. from Linda Marcusen, FDIC Closing Attorney, to Belinda Davis & Cliff Gilliard, FDIC Claims Agents in Charge of CBC's closure ["Marcusen Memo"]).) See also notes 11 and 13 infra.

6. Counts V and VI concerned wire transfer orders lodged by plaintiffs Dairland S.A. a/k/a Europa, Felker S.A., Mega Securities Ltd., and Venton Management Corp. The parties have stipulated to the voluntary dismissal with prejudice of these claims. However, these four plaintiffs' claims in Counts I through IV still remain before the Court.

to the imposition of a constructive trust against the FDIC in its dual capacities.[7] With respect to the counts that remain (Counts I and III), plaintiffs seek relief in several alternative forms, including the reclassification of the swept funds as deposits and the corresponding issuance of Class 2 receivership certificates by FDIC–R; the payment by FDIC–R of all accrued distributions plaintiffs would have received as Class 2 creditors, as well as any unpaid insurance proceeds from FDIC–C up to the $100,000 cap, plus interest; and the return to plaintiffs of all swept funds, plus interest.[8]

FDIC–R has moved for summary judgment or, in the alternative, for dismissal. FDIC–R argues that plaintiffs entered into contracts with CBC for the establishment of IBFs, and that the reclassification of plaintiffs' funds on the evening of the bank's closing was in conformance with those contracts. FDIC–R maintains that each plaintiff held only one account, not two, and that that account was an IBF, not a DDA. FDIC–R grounds its argument on Federal Reserve regulations and FDIC statutes and regulations, as well as on the International Account Opening Documentation ("IAOD") each plaintiff completed

**7.** In Count IV plaintiffs seek the imposition of a constructive trust on the post-closing swept funds. The Court is without jurisdiction to grant such relief. *See National Trust for Historic Preservation v. FDIC*, 21 F.3d 469, 472–73 (D.C.Cir.1994) (Wald, J., concurring). Count II (unjust enrichment) likewise seeks impermissible equitable relief. In any event, plaintiffs now concede that Counts II and IV are moot in light of the FDIC's representation that FDIC–R "has retained sufficient assets to pay plaintiffs their pro rata share of dividends to excess depositors, as if they had been deemed depositors from the time of the closing of the bank, and that if any judgment is entered against the defendants, it would be paid in depositor-class Receiver's Certificates (plus deposit insurance paid as appropriate)." (FDIC–C's Mem. in Opp'n to Pls.' Mot. for Summ. J. at 3–4; *see* Pls.' Reply Mem. in Supp. of Summ. J. Against FDIC–C at 2.) Accordingly, the Court dismisses Counts II and IV as moot.

**8.** The complaint of a further plaintiff, Cambios Norte S.A. ("Cambios"), was consolidated with the instant matter. However, Cambios' complaint differs from those of all other plaintiffs, and it is not resolved by this Memorandum Opinion. Cambios did not have an IBF at CBC. Instead, Cambios alleges that CBC and FDIC–R failed to honor its order, delivered prior to the closure of CBC, to transfer funds to another bank. Therefore, FDIC–R allegedly violated the Uniform Commercial Code, N.Y. U.C.C. § 4–301, and the FDI Act, 12 U.S.C. § 1811, *et seq.*, and the FDIC in its dual capacities was unjustly enriched. Cambios seeks, among other forms of

relief, that FDIC–R effectuate the transfer plus interest.

In response, the FDIC in its dual capacities requests summary judgment against Cambios. In each FDIC summary judgment motion, in identical three-line footnotes (*see, e.g.,* FDIC–R's Mot. for Summ. J. at 2 n.2), defendants summarily assert that Cambios has received all it is entitled to—$100,000 deposit insurance and a Class 2 receivership certificate for the balance in its DDA account. Subsequently, in its memoranda in opposition to plaintiffs' motions for summary judgment, the FDIC claims that its earlier footnotes constituted a motion for summary judgment against Cambios. (*See, e.g.,* FDIC–R's Mem. in Opp'n to Pls.' Mot. for Summ. J. at 1 n.1; *see also* Sur-reply of Defs. to Pl. Cambios Norte's Reply Mem. in Further Opp'n to the FDIC's Footnote Req. for Summ. J.) Cambios correctly objects to the form of the FDIC's "motion" for summary judgment. The FDIC has failed to comply with LCvR 56.1 as to plaintiff Cambios, and thus, the Court cannot enter summary judgment in favor of defendants. Moreover, because Cambios has not moved for summary judgment, this matter will apparently have to be tried.

Furthermore, plaintiff Elver Capital Ltd. ("Elver") is one of the twenty-five plaintiffs whose funds were swept by FDIC–R into uninsured IBF accounts. This Memorandum Opinion addresses Elver's claims relating to the sweep. However, Elver's additional claim concerning its CBC certificate of deposit account is not addressed herein, but will be addressed in a separate Memorandum Opinion.

with CBC or its predecessor. FDIC–R maintains that, regardless of how plaintiffs' accounts functioned, they must be treated as an IBF. Alternatively, FDIC–R argues that, even if plaintiffs had two accounts, FDIC–R had authority to reclassify plaintiffs' DDA funds as IBF holdings in the process of operating CBC and "winding up" the bank's affairs.

FDIC–C argues that, because its role is limited to regulating depository institutions and insuring deposits, it has no power to afford plaintiffs relief by granting their receivership claims. Because FDIC–C has paid out in full insurance funds corresponding to the amounts FDIC–R determined were held by plaintiffs in insured accounts, FDIC–C argues that it must be granted summary judgment on the basis that it has satisfied its statutory obligation. Alternatively, FDIC–C maintains that the case against it must be dismissed because plaintiffs have failed to state a cause of action on which relief can be granted.

Plaintiffs cross-move for summary judgment. Against FDIC–C, four plaintiffs argue that FDIC–C remains liable to them for any further sum found to be an insured deposit, up to the $100,000 cap (Count I). As for FDIC–R, plaintiffs claim in Count I that their rights were fixed at the time of CBC's closing, and therefore, because no standing order justified the receiver's reclassification of plaintiffs' funds from DDA to IBF accounts, FDIC–R violated the FDI Act, including the NDPA. Plaintiffs claim that the IAOD provided for, and that CBC in fact established, multiple accounts, including separate insured, NDPA-preferred DDAs, as well as uninsured, nonpreferred IBFs. In support of this position, plaintiffs note that FDIC–R treated plaintiffs as having separate accounts prior

to this litigation, even going so far as to have FDIC–C pay out insurance up to the $100,000 cap on the non-swept funds that remained in plaintiffs' DDAs when CBC closed on June 26, 2002. Plaintiffs contend that having two linked accounts was permissible, and even if it can be argued that CBC mishandled plaintiffs' IBF accounts, the error was attributable to the CBC and not to the plaintiffs, and therefore the FDIC, as CBC's receiver, must assume responsibility for the bank's error. Plaintiffs argue that FDIC–R's reclassification of their DDA funds subverts the NDPA and violates the agency's own policies and public statements. Finally, plaintiffs maintain that FDIC–R breached its fiduciary duty to plaintiffs by wasting their assets, forcing plaintiffs to make a post-closing deposit in IBFs to which they did not consent, and engaging in improper self-dealing by benefiting FDIC–C, because the reclassification of plaintiffs' funds eliminated millions of dollars from the pool of Class 2 claims, thereby increasing the net take of the largest Class 2 claimant, FDIC–C acting as subrogee. *See* 12 U.S.C. § 1821(g)(1).[9]

## LEGAL ANALYSIS

The parties agree that plaintiffs have exhausted their administrative remedies by filing with the FDIC claims for the swept funds, which claims were disallowed insofar as they sought Class 2 depositor liability status, rather than Class 3 general creditor status. (FDIC–C's & FDIC–R's Joint Stmt. of Material Facts ["FDIC Joint Stmt."] ¶ 33.) Based on this representation, this Court has jurisdiction over plaintiffs' lawsuit pursuant to 12 U.S.C. § 1821(d)(6)(A).[10]

---

9. This breach of fiduciary claim (Count III) applies *only* to FDIC–R.

10. Given the representation of the parties, plaintiffs appear to have complied with the requirements for judicial review pursuant to

This case turns on two inquiries. The first requires a determination of whether plaintiffs held two types of accounts at CBC, or just one type, an IBF. If the latter, then plaintiffs have suffered no wrong, for all they were entitled to from their uninsured IBF account was a Class 3 receivership certificate, which they have received.[11] But if the former proves correct, then the Court must proceed to the second question: did the receiver act properly by reclassifying plaintiffs' DDA deposits as IBF funds? The Court addresses these inquiries *seriatim*.

## I. Did Plaintiffs Each Have Two Types of Accounts at CBC?

■ The first inquiry is easily disposed of. Plaintiffs clearly held two accounts— one of which was an insured DDA, and the other an uninsured IBF. Plaintiffs' account statements indicate two separate accounts, each with a different number. (*See* FDIC Joint Stmt., Ex. 4.) The DDA statements contain all the normal indicia of a checking account, including a field for checks paid and references to incoming and outgoing wire transfers. They also show plaintiffs' funds being swept to a separate account marked as an IBF, which sweep is posted as a debit on the DDA statement, and the same funds being reposted several hours later to the DDA as a credit. Moreover, on its general ledger CBC accounted for plaintiffs' DDA accounts along with all other DDA accounts, but it segregated IBF accounts, and the bank's balance sheet for the IBF did not include plaintiffs' DDA

accounts. (*See* Marcusen Memo at 2.) In short, plaintiffs' DDAs are transactional checking accounts that fall squarely within the definition of "deposit" contained in the FDI Act, *see* 12 U.S.C. § 1813(*l*), thereby undercutting FDIC–R's argument that plaintiffs' accounts must necessarily be IBFs only.

Furthermore, the IAOD completed by each plaintiff when the accounts were established clearly contained language referring to multiple accounts. Indeed, most plaintiffs checked boxes on the form establishing the two separate accounts—"checking" and "International Banking Facility Deposit"—that FDIC–R now denies existed. (*See, e.g.*, FDIC Joint Stmt., Exs. 1–2.) Of those few plaintiffs that checked only one box, most opted only for a checking account, not an IBF, further negating FDIC–R's argument that plaintiffs had only one type of account and that account was an IBF. In any event, the FDIC's own regulations require it to "presume that deposited funds are actually owned in the manner indicated on the deposit account records of the insured depository institution." 12 C.F.R. § 330.5(a)(1). *See also FDIC v. Fedders Air Conditioning, USA, Inc.*, 35 F.3d 18, 22–23 (1st Cir.1994) (relying on bank records as evidence to support a claim of a deposit denied by FDIC–R). Because the bank's ledger and balance sheet, in addition to the IAOD, indicate that plaintiffs' DDAs and IBFs were separate, the FDIC–R, as required by its own

the monetary claims procedure established in 12 U.S.C. § 1821(d)(6)(A). *See National Trust*, 21 F.3d at 472. The Court notes, however, that even if plaintiffs had not so complied, it arguably has jurisdiction on the basis that FDIC–R exceeded its lawful authority, and therefore the strictures of the § 1821(d) administrative claims process would not be applicable. *See Auction Co. of Am. v. FDIC*, 141 F.3d 1198, 1201 (D.C.Cir.1998); *Nat'l*

*Union Fire Ins. Co. v. City Savings*, 28 F.3d 376, 390 n. 16, 392 n.22 (3d Cir.1994).

**11.** Indeed, plaintiffs will have realized a windfall, for they were paid $2.6 million in deposit insurance by FDIC–C for the funds FDIC–R did *not* sweep out of plaintiffs' DDA accounts on the night of June 26, 2004. *See* note 5 *supra*.

regulation, should have presumed that the two accounts existed independently.

The fallacy in FDIC–R's argument that plaintiffs did not hold DDAs is further demonstrated by its own actions at the time of CBC's closure. The FDIC closing attorney who provided the agency's answer to the very same question presently before the Court wrote unequivocally that "two accounts were established for the customer: a DDA and a Sweep Account." (Marcusen Memo at 2.) She further concluded that "[plaintiffs'] DDA accounts in question do not fall within the definition of an international banking facility deposit. Therefore, they should be treated as deposits for deposit insurance purposes."[12] (Id. at 3.) FDIC–R endeavors to demean the import of this opinion letter as "only one factor for the FDIC to consider in reaching its decision under the [FDI Act] receivership claims process" (FDIC–R's Mem. in Opp'n to Pls.' Mot. for Summ. J. at 6), but the FDIC's subsequent actions shortly after the bank's closing conform to the letter's conclusions—the agency paid $2.6 million in deposit insurance to plaintiffs on the funds that remained after the June 26 sweep in the very same DDAs the receiver now claims never existed.[13]

■ Furthermore, despite FDIC–R's assertions to the contrary (FDIC–R's Mot. for Summ. J. at 15–17; FDIC–R's Mem. in Opp'n to Pls.' Mot. for Summ. J. at 4–6), it is perfectly acceptable to establish a DDA to work in conjunction with an IBF at the same bank. The Federal Reserve has explicitly permitted for the arrangement used at CBC: "There is no prohibition against the transfer of funds in either direction between the United States and IBF books of the bank. Funds may be transferred automatically from an IBF time deposit at maturity to a deposit account at a U.S. office of the bank, and funds may be transferred from an account at the U.S. office to the IBF." Fed. Reserve Regulatory Service, ¶ 2–309.54.[14]

12. She based her reasoning on the some of the same factors that are persuasive here: "The DDA accounts in question do not fit within the definition of an 'international banking facility deposit' because these DDA accounts were not deposits segregated and accounted for in the IBF on CBC's books and records. Rather, they were included in and accounted for in the total DDA accounts on CBC's general ledger." (Marcusen Memo at 3.)

13. By the time it filed its opposition to plaintiffs' motion for summary judgment, FDIC–R confronted its irreconcilable positions regarding the existence of DDA accounts by stating that "the [deposit insurance] decision regarding the IBF was erroneous and [FDIC–R's] position in this suit is clear, that is, Plaintiffs' accounts were neither 'deposits' nor 'insured deposits.'" (FDIC–R's Mem. in Opp'n to Pls.' Mot. for Summ. J. at 7 n.7.) FDIC–R suggests that it would have a basis for a counterclaim based on the $2.6 million in deposit insurance it allegedly mistakenly paid plaintiffs, but it inexplicably states that "such an action is not contemplated." (Id.)

14. The question to which the Federal Reserve was responding proposed holding the funds for two days in the IBF, unlike the overnight procedure used at CBC. Fed. Reserve Regulatory Service, ¶ 2–309.54. FDIC–R argues that CBC's procedure did not comply with Federal Reserve regulations in the case of those plaintiffs who were not foreign banks or similar institutions, because such plaintiffs' funds, in order to qualify for IBF treatment, must be held in an IBF for at least two business days. 12 C.F.R. § 204.8(a)(2)(ii)(A). (Foreign banks and the like, including five plaintiffs (see Pls.' Resp. to FDIC Joint Stmt. ¶ 17; Pls.' Mot. for Summ. J. against FDIC–R at 29 n.27), are exempt from this requirement; their funds need only be held overnight. 12 C.F.R. § 204.8(a)(2)(i)(A).) This purported regulatory noncompliance leads, in FDIC–R's estimation, to the conclusion that the non-bank plaintiffs' funds must be categorized as IBFs. (See FDIC–R's Mot. for Summ. J. at 10). Whether CBC violated federal regulations by failing to hold certain plaintiffs' funds for less than the required period is of no significance, however, for any failure by the bank to com-

Therefore, a linked DDA–IBF arrangement, which has the effect of allowing interest to accrue in business checking accounts in spite of a prohibition against the payment of interest on a DDA account,[15] is proper, and indeed, it is consistent with the reasons that motivated Congress to permit the establishment of IBFs in the first place. *See* note 3 *supra.*

In sum, there is no ambiguity in CBC's records about whether multiple accounts—a DDA and an IBF—were established for each plaintiff. FDIC–R's reliance on any deviation by CBC either from federal regulations governing how DDAs and IBFs are to be operated, or from plaintiffs' expressed intent on the IAOD to open only a certain type of account is not relevant to this inquiry, for the bank's records are clear, and any improper creation or operation of accounts by CBC does not change the fact that multiple accounts were established and remained in existence at the time of CBC's closing. *Cf. Fedders*, 35 F.3d at 23. *See also* note 14 *supra.*

Therefore, because FDIC–R's argument that plaintiffs held only an IBF is flatly contradicted by the bank's records, which must be presumed correct; by Federal Reserve policy, which explicitly provides for linked DDA–IBF accounts; and by the FDIC's own pre-litigation analysis and treatment of plaintiffs' DDAs, the Court

rejects FDIC–R's *post hoc* litigation posture, *see Ernst & Young*, 374 F.3d at 583; *cf. Yukon–Kuskokwim Health Corp. v. NLRB*, 234 F.3d 714, 718 (D.C.Cir.2000) (rejecting *post hoc* litigation rationalization), and finds that plaintiffs held two accounts—an uninsured IBF and an insured DDA. This conclusion means that the Court must now turn to the second inquiry—was it proper for FDIC–R to sweep plaintiffs' funds into their IBFs on the night it closed CBC?

## II. Did FDIC–R Have the Authority to Sweep Plaintiffs' Funds?

FDIC–R makes much of its broad powers as receiver, but these powers are not without limits. By statute, FDIC–R succeeds to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i). But despite the receiver's significant authority to resolve the affairs of a failed bank, *see, e.g., Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 247 (D.C.Cir.1995), as well as FDIC–C's concomitant duty to pay out insured deposits "as soon as possible," *id.* § 1821(f)(1), FDIC–R does not enjoy

ply with regulations governing IBFs is the responsibility of CBC and the FDIC as its receiver; it cannot be attributed to plaintiffs. *See, e.g.,* 12 C.F.R. 204.8(e) (holding as responsible for mismanagement of an IBF only the bank itself); *cf. Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1306 n. 1 (D.C.Cir.1997) (explaining that FDIC–R "stands in the shoes of the insolvent institution") In any event, any such failure does not affect the fact that plaintiffs have otherwise shown the existence of two separate accounts. Moreover, the result that FDIC–R advocates—in the event of noncompliance with banking regulations, the designation of plaintiffs' accounts as uninsured IBFs

only—is nonsensical. FDIC–R has offered no reasoned basis for why CBC's alleged noncompliance in operating its DDAs justifies this Court's classifying plaintiffs' accounts as IBFs, when the consequence of such a finding would be the creation of an IBF that functions like a DDA checking account, which is simply not permitted by the regulations. *Compare* 12 C.F.R. § 204.2(b)(1)(i) & *id.* § 217.3 *with id.* § 204.8(a).

15. Under 12 C.F.R. § 217.3, "[n]o member bank of the Federal Reserve System shall, directly or indirectly, by any device whatsoever, pay any interest on any demand deposit."

carte blanche, for "there is no federal policy that the [deposit insurance] fund should always win." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). Courts have ruled numerous times that, despite its "800–pound gorilla"-like statutory powers, *Nashville Lodging*, 59 F.3d at 243, the FDIC overstepped its legal authority, *see, e.g., Ernst & Young*, 374 F.3d at 584; *Sharpe v. FDIC*, 126 F.3d 1147, 1155, 1157 (9th Cir. 1997); *Waterview Management Co. v. FDIC*, 105 F.3d 696, 701–02 (D.C.Cir. 1997); *cf. Nashville Lodging*, 59 F.3d at 246, and today this Court joins them.

■ In this case, FDIC–R seeks to justify its actions on the night of June 26, 2002, by arguing that they were "no different than what it did on thousands of other occasions since 1933—'wind up' CBC's affairs by allowing CBC employees to do what they did every other night, *i.e.*, complete the day's business in order to arrive at a final balance for the liquidation of CBC." (FDIC–R's Mot. for Summ. J. at 23.) While this characterization has a certain appeal, it is far too simplistic given the uniqueness of the situation that confronted FDIC–R when CBC failed. More importantly, it does not accurately reflect what in fact transpired that night. First, the sweep of plaintiffs' funds to IBF accounts

that took place at CBC after its staff had processed all pending transaction items was not a typical posting of an unprocessed transaction, as the FDIC–R attempts to imply. As is clear from the FDIC's *Manual of Instructions for Claim Agents*, which instructs FDIC agents regarding the winding up of the affairs of a failed bank:

> The rights of depositors are fixed as of the moment of the institution's closing. Thus, the books and records of the institution must be brought current and balanced to that point. All unprocessed transactions, including accrued but unpaid interest on interest-bearing accounts, are posted.

(Pls.' LCvR 56.1 Stmt., Ex. A at 4–22).[16] Under this protocol, the sweep of plaintiffs' funds to IBF accounts can hardly be viewed as an "unprocessed transaction," such as accounting for a cashed check not yet posted to a payor's account, since as of the time of the bank's closing, this was neither a transaction that was in process nor a transaction completed but not yet processed. Rather, if anything, the sweep that took place was a new transaction that was conducted at the direction of the FDIC–R after the normal business of the bank had been completed.[17] Furthermore,

---

16. *See also* Advisory Op. by Adrienne George, FDIC Att'y, *How Items in Process of Payment Are Handled When Payor Bank Fails*, FDIC 95–2, 1995 WL 218056, at *1 ["George Opinion"] ("First, in determining the rights of the depositors and/or other general creditors of the receivership estate, the FDIC as Receiver will process any completed but as yet unposted work prior to the closing to make the books of the institution current as of the close of business, on the day of the closing."), and the testimony of FDIC's Rule 30(b)(6) witness, Susan Brown, the Assistant Director of Accounting Operations in the FDIC's Division of Resolutions and Receiverships ("[T]he FDIC as receiver cannot initiate any banking transactions. It can only complete the day's work." (Pls.' LCvR 56.1 Stmt., Ex. SB at 51);

"We're trying to capture all the transactions that have been completed but not yet processed." (FDIC–R's Mem. in Opp'n to Pls.' Mot. for Summ. J., Ex. 11 at 35)).

17. The parties' debate the precise timing of CBC's closure, at which moment plaintiffs' rights were fixed (*see, e.g.,* Pls.' Mot. for Summ. J. against FDIC–R at 17–18; FDIC–R's Mem. in Opp'n to Pls.' Mot. for Summ. J. at 8–17; Pls.' Reply Mem. in Supp. of Summ. J. at 11–15) need not be resolved, for the operative question is not whether the bank was closed at three o'clock or five or some other time, but rather whether the sweep was pending or in process as of whatever moment the bank closed.

the record demonstrates that the sweeps initiated by FDIC–R departed in a critical manner from CBC's usual course of business. Funds were swept only out of plaintiffs' DDA accounts, and contrary to the usual practice at CBC, no funds were ever swept back into the DDAs.

Second, while it is beyond dispute that FDIC–R is granted broad powers to wind up the affairs of a failed institution, it has failed to cite any provision in either the statute or the regulations that would permit the sweep that occurred here. *See Nashville Lodging*, 59 F.3d at 243 (despite the broad statutory powers held by the receiver, those powers are not unlimited and do not override existing laws unless there is a conflict between the laws). As FDIC–R correctly notes (*see* FDIC–R's Mem. in Opp'n to Pls.' Mot. for Summ. J. at 18–19), it has weighty powers, including the power to perform all functions of the failed bank, 12 U.S.C. § 1821(d)(2)(B)(iii); preserve and conserve the assets of the institution, *id.* § 1821(d)(2)(B)(iv); and merge the failed bank with another insured bank. *Id.* § 1821(d)(2)(G)(i)(I). The receiver may exercise all necessary powers incidental to carrying out its specifically-granted powers as receiver, *id.* § 1821(d)(2)(J)(i); and may "take any action authorized by this chapter, which the Corporation determines is in the best interests of the depository institution, its depositors, or the Corporation." *Id.* § 1821(d)(2)(J)(ii). The receiver may also liquidate the bank and proceed to realize upon its assets, *id.* § 1821(d)(2)(E), and it may even "transfer any asset or liability of the institution in default... without any approval, assignment, or consent with respect to such transfer." *Id.* § 1821(d)(2)(G)(i)(II).

But none of these broad powers encompasses the right to reclassify deposits without authorization, where to do so has the effect of zeroing out a depositor's funds, as occurred here. Indeed, such an action would be antithetical to the FDIC's "basic mission [which] is to protect insured depositors." *E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 595 (D.C.Cir. 1994) (internal quotation marks and citation omitted). Moreover, a general allegation of statutory authority cannot suffice here; rather, the Court must look to each provision to see whether it affords FDIC–R the authority it claims. *Cf. Nashville Lodging*, 59 F.3d at 242 (citing *O'Melveny & Myers*, 512 U.S. at 85, 87, 114 S.Ct. 2048) (holding that a revision of the FDI Act does not displace preexisting state law except "where there is 'an explicit federal statutory provision,' or in those 'few and restricted' cases where there is a 'significant conflict between some federal policy or interest and the use of state law' ").[18]

---

18. While defendants fail to point to any enumerated power to justify their action, there is some suggestion that the transfer authority contained in 12 U.S.C. § 1821(d)(2)(G)(i)(II) sanctions FDIC–R's reclassification of plaintiffs' funds. A close examination, however, indicates that this provision fails to provide the receiver the necessary authority. First, the sweeps were reclassifications, not "transfers," within the meaning of § 821(d)(2)(G)(i)(II). In this respect, the Court notes that the broad definition of transfer set forth in § 1821(e)(8)(D)(viii) is limited to the FDIC's powers under subsection (e), which are not implicated by the instant case.

Moreover, as even the FDIC–R recognizes, the movement of plaintiffs' funds from their DDAs into IBFs can only be characterized as "analogous" to a "Transfer of Funds," since "[i]n reality, the so-called sweep was a renaming of monies the Plaintiffs left with CBC." (FDIC–R's Mot. for Summ. J. at 17.) Therefore, § 1821(d)(2)(G)(i)(II)'s "transfer" authority does not apply to this case. Second, reading § 1821(d)(2)(G)(i)(II) in conjunction with the surrounding provisions indicates that the transfer power is limited to the situation where a receiver transfers assets to another party who in turn assumes responsibility for them, such as in the case of a bank

In short, FDIC–R cannot cite to any specific statutory basis for its actions here.[19] FDIC–R nonetheless maintains that its preexisting policy statements establish that the sweeps at issue here were pending transactions that needed to be completed as part of FDIC–R's statutorily-authorized "operat[ion]" of the bank, including "conduct[ing] all [its] business," *see* 12 U.S.C. § 1821(d)(2)(B). (FDIC–R's Mem. in Opp'n to Pls.' Mot. for Summ. J. at 13–14) In particular, the receiver points to two advisory opinions (*see id.*) signed by FDIC legal staff that were publicly available at the time of CBC's closure. *See* George Opinion, and Advisory Op. by William F. Kroener III, FDIC Gen. Counsel, *Question Regarding the Effect of a Debit Card Transaction for Deposit Insurance Purposes,* FDIC 97–3, 1997 WL 842421. But as plaintiffs rightly contend (Pls.' Reply Mem. in Supp. of Summ. J. at 14), these opinions provide no concrete guidance as to whether an alleged "standing order" to sweep funds into an IBF account constitutes "unposted work," thereby rendering it part of the receiver's ongoing operation of the bank.[20]

Moreover, the irrelevancy of these two legal opinions becomes even clearer when one compares them to the FDIC legal opinion that actually addresses sweeps. (Pls.' LCvR 56.1 Stmt., Ex. T (May 15, 1998 Letter from R. Glenn Taylor, Senior Att'y, FDIC).) That opinion letter addresses a factual situation far more analogous to this case than the two opinions cited by FDIC–R.[21] It concerned "depos-

merger, *see id.* § 1821(d)(2)(G) & § 1821(d)(2)(G)(ii); *see also Waterview Management Co. v. FDIC,* 105 F.3d 696, 701 (D.C.Cir.1997), and therefore does not authorize FDIC–R's reclassification of plaintiffs' funds.

**19.** For this reason, the Court rejects FDIC–R's argument that its broad discretion to wind up CBC's affairs, including the authority to liquidate a bank or sell it in a "purchase and assumption" transaction, means that its sweep of plaintiffs' accounts is unreviewable. (FDIC–R's Mem. in Opp'n to Pls.' Mot. for Summ. J. at 19–20.) FDIC–R cites no persuasive evidence that demonstrates that Congress intended to grant FDIC–R unfettered discretion and unlimited statutory authority in winding up a failed bank's affairs. Rather, the evidence is to the contrary, for the FDI Act explicitly permits for an administrative claims process and for court review. 12 U.S.C. § 1821(d)(6)(A). Moreover, any assertion of unreviewable authority is contrary to law, *see Auction Co.,* 141 F.3d at 1201 (noting that, if the FDIC could take property without due process, serious constitutional problems would be presented); *Nat'l Union,* 28 F.3d at 390 n. 16 & 392 n. 22 (same), and the FDI Act, which only grants certain enumerated powers to the FDIC in its role as receiver for a failed bank. *See Nashville Lodging,* 59 F.3d at 243.

**20.** If anything, the George Opinion provides support for plaintiffs' position insofar as it states that FDIC–R "will process any completed but as yet unposted work *prior to the closing,*" but will not, for example, process drafts presented on Monday for payment on Tuesday (referred to as a "one-day delayed payable-through draft account") when the bank closed on Monday. (George Opinion (emphasis added).) Applying this analysis by analogy, it can be argued here that the DDA–IBF reclassifications should not have been carried out on the day CBC was closed, because they were orders that were not yet pending as of the close of CBC's last business day.

**21.** The letter indicates that "The comments expressed herein are those of the FDIC Legal Division and not of the FDIC itself. The FDIC issues formal interpretations of its rules and regulations pursuant to rulemaking proceedings only." (*Id.* at 2.) But the two legal statements FDIC–R seeks to rely on are likewise merely opinions of individual attorneys in the FDIC Legal Division and the mere fact of their publication as advisory opinions does not substantially elevate the degree of respect they deserve under *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

its subject to an overnight sweep process that invests all deposits in excess of $100,000 in a separate investment or mutual fund account at the end of each banking day." In the hypothetical case of a regulator's closing of a bank, "It is the FDIC's policy to process all transaction items that are pending as of the close of bank business. The question you pose, however, is whether following the failure of a depository institution would the FDIC honor the institution's agreement to 'sweep' funds from [the DDA] account at the end of the day. The short answer is no. Once a depository institution fails, the contractual obligation between the depository institution and the depositor for initiation of the 'sweep' transaction is terminated."[22]

■ Thus, the advisory opinions cited by FDIC–R do little to advance its case, since they do not speak specifically to the circumstances at hand. Rather, the only pronouncements by FDIC attorneys that are on point buttress the result advocated by plaintiffs. While none of these letters or opinions is entitled to deference under *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), because they lack the indicia of pronouncements bearing the force of law, *see Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *see also Proffitt v. FDIC,* 200 F.3d 855, 860 (D.C.Cir.2000) (denying *Chevron* deference to FDIC interpretations of the FDI Act, because the statute's interpretation is entrusted to

multiple agencies); *Collins v. NTSB,* 351 F.3d 1246, 1253 (D.C.Cir.2003) (explaining *Profitt* ), the Court finds that those legal opinions that focus specifically on the treatment of swept funds are, at least, entitled to more respect under *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161, than the two opinions cited by FDIC–R, because of the former letters' "power to persuade." *Id.; see Collins,* 351 F.3d at 1253–54.

The Court must therefore reject FDIC–R's argument that the sweep of plaintiffs' funds into the IBF accounts is somehow subsumed within its inherent powers as receiver or can be justified as part of "operat[ing]" CBC. *See* 12 U.S.C. § 1821(d)(2)(B). There is no statutory provision or regulation that authorizes this action, and the only informal legal opinions that address the subject support plaintiffs', and not defendants', position.

Despite the absence of any statutory or regulatory authority to sustain its action, FDIC–R points, as an alternative justification, to a general agreement between the plaintiffs and CBC to sweep the funds in the manner carried out following the bank's failure. The receiver's view is that the sweep was required in order to effectuate the terms of a "contract" between plaintiffs and CBC for the creation of an uninsured IBF. (FDIC–R's Mot. for Summ. J. at 12–15.) But the documents on which defendant relies neither create such a duty to sweep nor grant it discretion to do so. FDIC–R claims that full effect must be given to the IAOD (*id.* at

---

**22.** The only other pronouncement by a FDIC attorney that relates specifically to sweeps that has been brought to the Court's attention is a 1988 FDIC Advisory Opinion. *See* Advisory Op. by Jules Bernard, FDIC Senior Att'y, *Insurance on Deposits Subject to Bank's Corporate Automated Sweep Program,* FDIC 88–63, 1988 WL 583083. This opinion advises that in the case of a bank failure, how swept funds are treated by the FDIC depends on where these funds are held at the time of closing. So, for example, if the funds had not been swept into an overnight mutual fund at the time of the failure, they would still be in the DDA and thereby entitled to insurance coverage. (*Id.*) Based on the logic of this opinion, it follows that plaintiffs' funds were likewise still in the DDA accounts at the time of closing.

14), including paragraph seven of the Account Agreement, which reads "International Banking Facility deposits are not FDIC insured and are subject to the rules and regulations of the Board of Governors of the Federal Reserve System." (*See* FDIC Joint Stmt., Ex. 2.) But how this clause establishes that there was a contract for plaintiffs' funds to be swept from their insured DDAs to uninsured IBFs is, at best, puzzling. Certainly, this paragraph can be given full effect without dictating a nightly sweep. A plain reading requires only that, at the time of bank failure, any funds in an IBF would be uninsured; it does not preclude the maintenance of other insured accounts, such as DDAs, that were also created pursuant to the IAOD.

The only other evidence of a sweep contract that FDIC–R can cite to is a "Sweep Account—Open/Maintenance Request" that is not included in the IAOD. (*See* FDIC Joint Stmt., Exs. 7–8.) This form does not specify the frequency of the sweeps, how long they were to take, or whether they were to occur during the course of the business day or overnight; it simply sets forth a floor, ceiling, and dollar increment for sweeps. This internal CBC form, which was not signed by plaintiffs, does not therefore support FDIC–R's argument that it had authority to recharacterize plaintiffs' funds as was done at its direction on the night of June 26, 2002, as part of CBC's routine, pre-closing business activities.

**CONCLUSION**

Accordingly, the Court must grant summary judgment against FDIC–R because it concludes that FDIC–R acted without the requisite authority, since the sweep of plaintiffs' funds to the IBF accounts was a new transaction that was neither authorized by plaintiffs nor by FDIC–R's statutory authority to operate CBC.[23] The Court also grants summary judgment in favor of plaintiffs as against FDIC–C for its underpayment of deposit insurance in four cases as a consequence of FDIC–R's sweep of funds from the DDA insured accounts.[24] The FDIC–C is thus directed to pay plaintiffs Dartley Bank & Trust Ltd., Elver Capital Ltd., Ourinvest Capital, Inc., and Raintree Ltd. any remaining deposit insurance they would have been due, had their swept funds been deemed insured deposits at the time of CBC's closing, and FDIC–R is directed to issue Class 2 ("excess deposit") receivership certificates to each of the twenty-five plaintiffs in the amount it would have received, plus interest, had its swept funds been deemed insured deposits at the time of CBC's closing.

An appropriate Order accompanies this Memorandum Opinion.

**23.** Because the Court grants summary judgment on Count I, and because plaintiffs will receive all they are entitled to, the Court need not reach plaintiffs' Count III (fiduciary duty) arguments.

**24.** Given this resolution of the case, the only claims against FDIC–C that remain are those of the four plaintiffs who received less than $100,000 in deposit insurance. FDIC–C's core responsibility to plaintiffs was to pay them deposit insurance. (*See* FDIC–C's Mot.

for Summ. J. at 8.) FDIC–C properly discharged this role as to all but four plaintiffs since it paid the other plaintiffs as much as permitted by statute and regulation. *See* 12 U.S.C. § 1821(a)(1)(B); 12 C.F.R. § 330.11. Therefore, the Court enters summary judgment against FDIC–C under Count I, and orders it to discharge its obligation to the four plaintiffs by paying them any deposit insurance they remain due, up to the legal limit.