ADAGIO INVESTMENT HOLDING LTD., et al., Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE CORP. in its Corporate Capacity and as Receiver for the Connecticut Bank of Commerce, Defendants.

No. CIV.A.02–2550 ESH.

United States District Court, District of Columbia.

Oct. 1, 2004.

Jami Lynn Wyatt, Stephen S. Kaye, Vanessa Alison Yelvington Chandler, Bryan Cave LLP, Washington, DC, Kathleen M. Kundar, Fox Horan & Camerini LLP, Marshall Beil, Mcguirewoods LLP, Barry Robert Fischer, Sprour Fischer & Mandell LLP, New York City, Julian Karpoff, Karpoff & Title, Arlington, VA, for Plaintiffs.

Alan Leonard Spear, John Allen Davidovich, Federal Deposit Insurance Corporation, Legal Division, Washington, DC, for Defendants.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiff Elver Capital Ltd. ("Elver") alleges that FDIC improperly classified Elver's certificate of deposit ("CD") held at the Connecticut Bank of Commerce ("CBC") when it failed in June 2002. FDIC determined that Elver's CD was not a conventional CD, but rather was an "IBF CD," which categorization deprived plaintiff of both deposit insurance and a viable claim against the FDIC-administered receivership estate. Presently before the Court is plaintiff's partial motion for summary judgment. Having reviewed the pleadings and undisputed evidence, the Court concludes that plaintiff's motion should be granted because FDIC, contrary to its regulations, failed to rely on the

bank's records, which, along with the testimony of CBC officials, establish that Elver's CD was a garden-variety CD, and not an IBF CD.

## BACKGROUND

On July 5, 2001, Elver, a British Virgin Islands corporation, completed CBC's International Account Opening Documentation ("IAOD"), checking three boxes: "checking" (also known as a demand deposit account or "DDA"), "International Banking Facility Deposit—Non–Bank Customer" (also known as an "IBF"),[1] and "Certificate of Deposit." (Elver's Motion for Partial Summary Judgment ["Elver's Mot."], Ex. B at 2.) The bank established three different account numbers corresponding to each type of account that Elver had opened. (*See, e.g., id.,* Ex. C.) Elver's checking account statements reflect funds flowing daily between the checking and IBF accounts, and they also indicate the quarterly maturing and contemporaneous issuance of a replacement ninety-day $250,000 CD in Elver's name.

After CBC was closed by order of the Connecticut Superior Court on June 26, 2002, FDIC accepted appointment as the bank's receiver and began the process of determining which accountholders' funds qualified for deposit insurance and how claims against CBC's receivership estate were to be prioritized. FDIC ultimately concluded that Elver's CD was an IBF CD, rather than an ordinary CD. Had the latter been the case, FDIC, in its corporate capacity, would have paid Elver $100,000 in deposit insurance, and pursuant to the National Depositor Preference Act ("NDPA"), 12 U.S.C. § 1821(d)(11), FDIC, in its capacity as receiver for CBC, would have issued a Class 2 receivership certificate for the CD's remaining $150,000.[2] However, having been classified as an owner of an IBF CD, Elver received no deposit insurance and was issued a Class 3 receivership certificate, which as a practical matter has no monetary value.

Thus, the issue presented is whether FDIC violated the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.* ("FDI Act"), and related regulations when it designated Elver's CD as an IBF CD account, as opposed to an insured and NDPA-preferred ordinary certificate of deposit account.

## LEGAL ANALYSIS

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Wash. Post Co. v. United States Dep't of Health*

---

**1.** *See Adagio Investment Holding Ltd. v. FDIC,* 338 F.Supp.2d 71 (D.D.C.2004) ("Mem.Op."), which explains the difference between DDA and IBF accounts. That Memorandum Opinion also provides greater detail about the events surrounding the winding up of CBC's affairs. The Court's factual discussion here is therefore limited to those facts essential to deciding Elver's motion concerning its CD.

**2.** To date, such receivership certificates have been paid sixty-one cents on the dollar. (*See* Mem. Op. at 3 n. 4 (describing different classes of receivership certificates under NDPA).)

*and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C.Cir.1987). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

In addressing plaintiff's motion, FDIC correctly notes that, "[i]n making the [CD] insurance determinations, FDIC is entitled to rely exclusively on the deposit account records of a failed institution." (FDIC's Mem. in Opp'n to Elver's Mot. for Summ. J. ["FDIC's Opp'n"] at 3.) Indeed, FDIC is *required* to rely on them, unless it finds them ambiguous. 12 C.F.R. § 330.5(a)(1). *See also FDIC v. Fedders Air Conditioning, USA, Inc.*, 35 F.3d 18, 22–23 (1st Cir.1994) (relying on bank records as evidence to support a claim of a deposit denied by FDIC). This principle, which FDIC purportedly followed in classifying Elver's CD as an IBF CD, guides this Court's analysis. However, because the Court cannot agree Elver's money was deposited in an IBF CD in light of CBC's unambiguous records, it grants partial summary judgment in favor of Elver.

First, plaintiff's IAOD clearly reflected Elver's choice to open three separate types of account, including a "certificate of deposit" that made no reference to an international banking facility. (Elver's Mot., Ex. B at 2.) Moreover, as explained in the Court's September 28 Memorandum Opinion, an international customer's decision to open an IBF in addition to a checking account did not transform all facets of the customer's banking relationship with CBC into an IBF.[3] (*See* Mem. Op. at 12.) Rather, Elver—like twenty-four other similarly-situated plaintiffs—had separate DDA and IBF accounts. This same reasoning applies to Elver's decision to open a CD in addition to a DDA and an IBF—the IAOD clearly reflects Elver's intent to open a CD, but in no way supports the notion that the CD was an IBF CD. (*See, e.g., id.* at 9 (discussing effect of each plaintiff's IAOD designation of which account types to open), 19 (discussing irrelevance of IAOD ¶ 7 in determining whether each plaintiff's funds must be "swept" into an IBF in order to effectuate the IAOD's terms).) Therefore, since the IAOD filled out by Elver indicates its intent to open an ordinary CD, there is no basis to argue that the IAOD established an IBF CD, which is itself such an obscure financial instrument that the FDIC claims agent in charge of CBC's closure had only encountered it once before. (*See* Elver's Mot., Ex. F at 120 (Gilliard deposition).)

---

**3.** Indeed, FDIC's basic rationale for categorizing Elver's CD as IBF funds appears to be this flawed reasoning, which this Court already rejected. For example, FDIC Claims Agent Cliff Gilliard rejected the notion that Elver had both a DDA and an IBF, and insisted that "this whole relationship is an IBF." (*See* Elver's Mot., Ex. F at 132 (Gilliard deposition).) Based on this erroneous conclusion, whether DDA or IBF funds were used to buy the CD was not even a question for FDIC, because its agent in charge considered *all* Elver's funds to be IBF funds, and therefore, FDIC reasoned that the CD must necessarily have been an IBF as well. Having already found this reasoning to be contrary to the evidence, the Court likewise rejects its application to Elver's CD.

Second, Elver's account statements confirm that CBC in fact established the three account types requested on the IAOD. Elver's DDA statement shows numerous wire transfers, the IBF overnight sweeps, and the quarterly maturing of a $250,000 CD, with corresponding interest, and the contemporaneous issuance of a replacement ninety-day CD for $250,000, with an interest rate of 2.6% as of May 7, 2002. (*See, e.g., id.,* Ex. C.) Nothing in the statement would signal to Elver, FDIC, or this Court that Elver's CD was anything other than a regular CD. Rather, the statement simply reflects a "Deposit from closed CD," *giving the certificate number and amount, and later that day shows a* "Transfer to CD Acct.," giving a new certificate number, the date of maturity, and the interest rate. There is no reference to an IBF in the CD line items. By contrast, the IBF sweep is clearly listed as "Transfer into IBF/Transfer Cdt. [credit]" and "Transfer From IBF/Transfer Dr. [debit]." Therefore, Elver's account statement does not support, and indeed refutes, FDIC's attempt to merge Elver's CD with its IBF.

Third, there is no evidence to support the contention that Elver's CD was somehow linked to its IBF, thereby rendering the CD an IBF CD. Elver's CD had a different account number from its IBF (*see id.,* Exs. C, D), and it received a higher rate of interest on the funds in the CD, as compared to the IBF. (*See* Elver's Mot., Ex. H at 86 (Gomez deposition).) And, although funds from Elver's CD and its IBF accounts were deposited in Elver's DDA checking account on the day each quarter when the CD matured, a new CD was always purchased contemporaneously in precisely the same amount as the CD that had just matured. (*See, e.g., id.,* Ex. C.)

In addition to these bank records, the testimony of CBC officials also refutes FDIC's theory that an IBF CD was offered to the bank's customers. Carmen Gomez, an international account officer at CBC, stated emphatically that the bank did not offer IBF CDs. (*Id.,* Ex. H at 84 (Gomez deposition).) So did CBC's Senior Vice President, Benjamin Canto. (*Id.,* Ex. I at 167 (Canto deposition).) Moreover, Joseph Bush, Jr., FDIC's Senior Financial Management Analyst in charge of numerous FDIC functions with respect to the closing of CBC (FDIC's Opp'n, Ex. 18 at 1), conceded that, despite his assertion that CBC offered IBF CDs to its customers, Ms. Gomez's and Mr. Canto's knowledge of what products CBC offered would "trump" his own. (Elver's Reply, Ex. Z at 87 (Bush deposition).)

Thus, FDIC has not shown that Elver chose to, or was even able to, open an IBF CD. The bank records that relate specifically to plaintiff's account demonstrate unequivocally that Elver's CD was a regular CD, not an IBF CD. Bank officials in a position to know what products they offered customers also testified that CBC did not offer IBF CDs. Therefore, as required by 12 C.F.R. § 330.5(a)(1), the Court must conclude that the bank's records clearly show that Elver's CD was not an IBF CD, and, indeed, customer IBF CDs were a fiction first created by FDIC after it assumed control of the bank.

Despite the compelling and unrebutted evidence from the bank's account documents relating to Elver and from CBC officials, FDIC argues that CBC's internal records and its general ledger show that Elver's CD was in "Branch 31" and that this somehow rendered the CD part of Elver's IBF account. While it is true that Elver's CD was reflected in Branch 31 on CBC's books and records (*see* FDIC's Opp'n, Ex. 13), the leap that Branch 31 was equivalent to a customer IBF CD

account is simply inconsistent with the evidence.

As FDIC argues, CBC, for internal bookkeeping purposes, treated Elver's CD as part of "Branch 31," which was not a physical bank branch, but rather was a category used by CBC to refer to "IBF/Correspondent Banking CD Offshore >100K." (*Id.*) Elsewhere, Branch 31 was referred to simply as "IBF/Correspondent Banking." (Elver's Reply, Ex. W.) But the moniker in and of itself proves nothing. Rather, it is necessary to examine the records relating to Branch 31 to understand the error made by FDIC. For, as is clear from FDIC's own records, Branch 31 contained *CBC's* IBF money, and this money was invested by CBC with a correspondent bank (M & T Bank) in Buffalo, New York. In other words, there was an IBF CD, but it belonged to CBC, not its customers, and it was funded by foreign investors' funds, some of which were customers' IBF funds, while others were ordinary insured deposits like CDs.

As correctly argued by Elver, this is the only reasonable interpretation of the bank's internal records. (Elver's Reply at 4–5.) For instance, on the day that CBC closed, June 26, 2002, the bank purchased a $25 million CD at 1.75%, which was due to mature the following day. The accrued overnight interest was $1215.28. (Elver's Reply, Ex. U.) Records indicate that this overnight investment came from Branch 31 and was accounted for as "GL [General Ledger] 1381—O/N [Overnight] Placements—IBF." (*Id.*, Exs. U, V.) Moreover, and most importantly, the Branch 31 mo-

nies that CBC invested overnight at M & T Bank came from two distinct sources: (1) the sweeps involving IBF and DDA accounts of foreign investors, and (2) CDs held by foreign investors. Thus, on the day the bank closed, the total amount on deposit in Branch 31 was $25 million, consisting of $1.4 million from seven CDs held by Elver and other foreign investors, plus CBC's IBF–DDA sweeps monies. (Elver's Reply, Exs. S, T; FDIC's Opp'n, Exs. 15, 18A, 18B.) This $25 million CBC account represented a significant part of the bank's foreign account liability, which CBC invested overnight in its name as a combined IBF CD at a correspondent bank in Buffalo for CBC's (not the foreign investors') benefit. In short, Elver never had, nor did CBC treat it as having, an IBF CD. Rather, only CBC had such an account, and the money in this account came from Branch 31.

To further compound the problem, FDIC proceeded, after the closing of CBC, to create various documents that mischaracterized Elver's CD as an IBF CD. (*See, e.g.,* Elver's Mot., Ex. J (prepared by FDIC Claims Agent Gilliard, *see id.,* Ex. F at 140); *id.,* Ex. K (also prepared by FDIC, as conceded by Gilliard, *see id.,* Ex. F at 144–45); and FDIC's Opp'n, Exs. 18A, 18B (handwritten notes on these documents were added by FDIC after the bank's closure).)[4] Moreover, these documents do not constitute "deposit account records of the insured depository institution," 12 C.F.R. § 330.5(a)(1), and they cannot be relied upon to argue that there is a disputed issue of fact as to the nature of Elver's CD.[5]

---

4. Exs. 18A and 18B, while generated from the CBC's computer records, show only that Elver's CD, along with the CDs of other foreign investors, was in Branch 31. As explained herein, this fact, while undisputed, is of no significance to the issue presented here.

5. Similarly, FDIC cannot rely on Claims Agent Gilliard's testimony that "[b]ased on the information that we received from other bank employees [*i.e.,* other than Mr. Canto, whose testimony he was refuting], [CBC] did have CDs that were considered IBF" (FDIC's

In addition to its incorrect interpretation of the meaning of Branch 31, FDIC relies on the deposition testimony of Mercedes Braida, a CBC foreign exchange trader, who stated that some IBFs were made up of certificates of deposit. (FDIC's Opp'n, Ex. 14 at 82.) Yet, Ms. Braida's testimony does not justify an inference that Elver's CD was an IBF CD. Rather, it supports the undisputed proposition that the Branch 31 account included customers' certificates of deposit, but it in no way indiscriminately lumps those CDs with the IBFs of these same customers, as FDIC attempts to do here. Moreover, insofar as Ms. Braida's testimony is at times confusing and ambiguous, this is likely attributable to the fact that she apparently did not interact with foreign accountholders such as Elver. Rather, she was a foreign exchange trader whom her boss did not consider a normal international account officer. (Elver's Mot., Ex. G at 37–38 (deposition of CBC International Division Executive Vice President Martin).) As a consequence, she admitted, for instance, that she "wouldn't know what type of document they [the bank] require" to reflect a client's request concerning the opening of a CD. (FDIC Opp'n, Ex. 14 at 83–84.) It is therefore not surprising that Ms. Braida did not clearly recognize the difference between CBC's offering IBF CDs as a product to its customers and CBC's purchasing an IBF CD for itself for overnight investment purposes. As a result, even though Ms. Braida understood that customer CDs were part of Branch 31, her testimony cannot be stretched to support an argument that Elver's CD was an IBF CD.[6]

Opp'n, Ex. 12 at 122), since it fails to identify the unnamed "other bank employees."

Also, the Court cannot credit the testimony of CBC Finance Division Senior Vice President Louis Messerre. Mr. Messerre testified, only on the basis of an *FDIC* document created after CBC's closing, and not based on any CBC record or purported knowledge of CBC International Division practices, that "Yeah, I think they were certificate of deposits to IBF." (*Id.*, Ex. 16 at 79.)

**6.** FDIC also argues that because Elver's CD account number began with the number one, it was an IBF. (FDIC's Opp'n at 11–12.) FDIC misconstrues the testimony of CBC Senior Vice President Canto in order to support its argument. Immediately after quoting Mr. Canto's deposition testimony that "The 1—the 1 and the 0 denoted the IBF account number" (FDIC's Opp'n, Ex. 17 at 86), FDIC asserts that, because Elver's CD account was number 17985004, it was an IBF CD. (FDIC's Opp'n at 12.) This argument completely ignores the fact that Mr. Canto testified that an IBF account number begins with a one *and* a zero. Furthermore, that section of Mr. Canto's testimony concerned the IBF sweep accounts that were the subject of this Court's September 28 Memorandum Opinion, rather than Elver's CD. (*See* FDIC's Opp'n, Ex. 17 (referring to IBF sweeps in an account statement).) The account statements submitted by FDIC as exhibits in the IBF sweeps litigation confirm Mr. Canto's description and the error of FDIC's position. For instance, Adagio Investments Holding Ltd.'s statement for its DDA account number 30173027—8 digits—shows money being swept to and from its IBF account, which was a ten digit number comprised of the prefix 10 plus the DDA account number, *i.e.*, 1030173027. (FDIC's *Joint Stmt. of Material Facts*, Ex. 4.) The same type of account statements submitted in this litigation for Elver show that its DDA account number was 30172985, and its IBF sweep account 1030172985, repeating the approach used for Adagio's accounts. (Elver's Mot., Exs. C, D.) By contrast, those same statements show that the numbers for Elver's CDs were nine digits, lacked the prefix 10 (instead beginning simply with a 1) and dropped the first two DDA account number digits 30, as well. Instead, each subsequent CD gained a sequential three digit suffix. Thus, Elver's second CD, which matured on February 5, 2002, was number 172985002, and its fourth, which was still outstanding as of CBC's closing and is the subject of this suit, was 172985004. (*Id.*) Clearly, Mr. Canto's description of how CBC formulated IBF account numbers was

### CONCLUSION

In sum, the evidence before the Court indicates that the only reasonable inference is that Elver's CD was not an IBF CD. FDIC violated the FDI Act and its own regulations by characterizing Elver's CD as an uninsured and NDPA non-preferred bank liability, when in fact the bank's own records clearly showed it to be a CD that was an insured deposit for FDI Act purposes. *See* 12 U.S.C. § 1813(*l*). Accordingly, FDIC is directed to pay plaintiff deposit insurance up to the legal limit ($100,000) on Elver's CD and to issue a Class 2 "excess deposit" receivership certificate for the remainder.

An appropriate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons given in the Memorandum Opinion issued this date, it is hereby

**ORDERED** that plaintiff Elver Capital, Ltd.'s motion for partial summary judgment against FDIC [# 50] is **GRANTED**; and it is

**FURTHER ORDERED** that FDIC in its corporate capacity is directed to pay plaintiff Elver deposit insurance on its certificate of deposit held at Connecticut Bank of Commerce ("CBC"); and it is

**FURTHER ORDERED** FDIC in its capacity as receiver for CBC is directed to issue Class 2 ("excess deposit") receivership certificates to Elver for any amount it remains due on its certificate of deposit

claim against CBC, after deposit insurance has been paid.

---

correct, and FDIC's misunderstanding of his testimony and oversimplification of CBC's practices do not create an issue of fact. If anything, Mr. Canto's testimony and the difference between the IBF and CD numbering schemes supports a finding that Elver's CD was *not* an IBF CD. Moreover, FDIC's own annotation indicates that it did not characterize as IBF CDs numerous other CDs that began with the number 1, including several that began with the prefix 10. (FDIC's Opp'n, Ex. 18A.)