# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-2619

FEDERAL DEPOSIT INSURANCE CORPORATION,

*Plaintiff-Appellant*,

v.

ERNST & YOUNG LLP,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 7914—**Robert W. Gettleman**, *Judge*.

_____

ARGUED NOVEMBER 4, 2003—DECIDED JULY 8, 2004

_____

Before EASTERBROOK, ROVNER, and EVANS, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. For almost a decade Superior Bank FSB participated in the sub-prime lending market, making loans to home and auto buyers with poor credit records. It then sold to public investors interests in pools of these loans; the process is known as securitization. Investors were promised a fixed rate of interest lower than the one the borrowers had agreed to pay Superior. Securitization creates diversification; a pool of loans is safer than

any one loan (and fractional interests in many pools are safer than one pool), unless defaults are perfectly (and positively) correlated. Superior held a residual interest in these pools to the extent that the total return exceeded the fixed rate promised to the investors. Two things could drain value from this retained interest: an unexpectedly high default rate, or an unexpectedly high prepayment rate (for if the borrowers prepaid, then Superior would not receive the high contractual interest rate). At one point Superior reported that its retained interest in securitized loans was worth about $1 billion. When interest rates fell during the late 1990s, however, borrowers began to prepay and refinance their loans more frequently. In January 2001 Ernst & Young, Superior's auditors, concluded that Superior's accounts must be restated to reduce the value of the retained interests by $270 million; a write-down of a further $150 million soon followed.

Disappearance of $420 million that had been booked as investors' equity left Superior insolvent, and the Federal Deposit Insurance Corporation assumed control in July 2001. The FDIC appointed a conservator to wind down Superior's business; as manager of the Savings Association Insurance Fund, the FDIC supplied credit to facilitate this process and assure that all insured depositors would be paid in full. The FDIC says that the net loss to the insurance fund exceeds $500 million. Superior's equity owners have promised to pay $460 million over time. Believing that the accountants also bear responsibility for the bank's failure—that generally accepted accounting principles required the residual interests to be discounted in light of the possibility of prepayments and other events that could intervene before the outside investors had been paid off—the FDIC has sued Ernst & Young for hefty compensatory and punitive damages. Illinois law, which the FDIC agrees controls, permits third parties such as investors to sue accountants for fraud (which the FDIC alleges). 225 ILCS

450/30.1(1). It allows third parties to recover for ordinary negligence (which the FDIC also alleges) if the accountant knew that "a primary intent of the client was for the professional services to benefit . . . the particular person bringing the action". 225 ILCS 450/30.1(2). If the FDIC prevails, 25% will go to the equity investors (effectively reducing the net proceeds of that settlement) and the rest will be applied to the benefit of Superior's other creditors, principally the insurance fund.

By referring to "the FDIC" as the plaintiff, we have simplified unduly—for that agency acts in multiple capacities, and the difference affects this litigation. For many purposes it is helpful to treat the FDIC as two entities: FDIC-Receiver and FDIC-Corporate. (The FDIC has a third capacity as bank overseer and regulator.) FDIC-Receiver acquires the assets and legal interests of the failed bank and proceeds much as a trustee in bankruptcy; FDIC-Corporate acts as guardian of the public fisc, disburses proceeds from the insurance fund, and having paid insurance claims is subrogated to rights of the bank's depositors against the failed institution. See 12 U.S.C. §1821(g). FDIC-Corporate also holds the right to prosecute claims against the failed bank's officers and owners. 12 U.S.C. §1821(k). As we have recounted, FDIC-Corporate has secured a substantial settlement from Superior Bank's managers and equity investors. Other claims held by the failed bank (as opposed to its depositors) come within the control of FDIC-Receiver. Accounting misconduct, like legal malpractice, may entitle the client (and FDIC-Receiver as its proxy) to recover damages. But FDIC-Receiver has neither sued Ernst & Young nor assigned that right to FDIC-Corporate. See 12 U.S.C. §1823(d) (permitting FDIC-Receiver to sell or assign choses in action to FDIC-Corporate). Instead FDIC-Corporate has sued without benefit of an assignment. The FDIC believes that this maneuver allows it to avoid two terms of the contract by which Superior Bank engaged Ernst &

Young. Superior Bank promised to arbitrate any disputes with the accounting firm, and it also waived any claim to punitive damages. FDIC-Receiver steps into the shoes of the failed bank and is bound by the rules that the bank itself would encounter in litigation. See *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994). But FDIC-Corporate did not assume Superior Bank's contracts and can litigate free of Superior's promises. See *EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002) (federal agency not bound by arbitration clause when it litigates in its own name, even though persons who agreed to arbitrate would be the principal beneficiaries of a favorable judgment).

Ernst & Young argued that the FDIC sued in the wrong capacity—and that if the agency's capacity were changed to reflect that FDIC-Receiver is the proper adversary, then the suit must be dismissed in favor of arbitration. The district court did not directly resolve these contentions. Instead it dismissed the suit for lack of standing. 256 F. Supp. 2d 798, reconsideration denied, 216 F.R.D. 422 (2003). As the judge saw matters, suit by FDIC-Corporate would frustrate the operation of 12 U.S.C. §1821(d)(11)(A), which establishes preferences among creditors in the failed bank. FDIC-Receiver must apply any recoveries first to secured creditors, then to pay off any uninsured depositors, next to general creditors, and finally to subordinated claims (including those of the shareholders). But FDIC-Corporate could satisfy its own claims as insurer first before turning over any excess to FDIC-Receiver for distribution under the statutory priority.

What this has to do with "standing" is unfathomable. A person whose injury can be redressed by a favorable judgment has standing to litigate. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992). FDIC-Corporate suffered an injury when it disbursed money from the insurance fund; it asserts that Ernst & Young caused (part of) this loss; and the loss can be redressed (and the fund

replenished) by a judgment for money damages against Ernst & Young. Nothing more is required for standing. At all events, FDIC-Corporate has promised to distribute proceeds of the litigation just as if they had come to FDIC-Receiver. The district court was skeptical about this promise but did not explain why the FDIC should be thought untrustworthy (one branch of government should not assume that another is deceitful), let alone why such an undertaking could not be enforced if the FDIC reneged. Promises by the Executive Branch to pay money other than as statutes require do not estop the United States, because the Constitution gives Congress the power to control distributions from the Treasury. See *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990). But a promise to abide by a federal statute poses no such difficulties. Section 1821(d)(11)(A) does not block this litigation.

But why should FDIC-Corporate be allowed to pursue a claim that §1821 seemingly allocates to FDIC-Receiver? The FDIC's principal response is: "What's to prevent it?" No statute says that FDIC-Corporate is *forbidden* to sue third parties such as lawyers and accountants. As FDIC-Corporate sees things, §1821(g) authorizes it to sue the failed institution as subrogee of the depositors, and §1821(k) authorizes it to sue the managers and investors; everything else is optional. If state law would allow an insurer (say) to sue the firm's accountant, then off we go. That no decision of any federal appellate court—or for that matter any Illinois court—vindicates its claim just means (FDIC-Corporate insists) that this is the first suit; it does not mean that FDIC-Corporate should lose. *O'Melveny & Myers* holds that state law governs litigation in the wake of bank failures; and as Illinois permits third parties to recover from accountants on account of injuries caused by fraud, whether or not the accountant knew that its client intended to benefit this third party, FDIC-Corporate believes that it is entitled to proceed. (The claim of fraud makes it unneces-

sary to determine what 225 ILCS 450/30.1(2) means in conditioning negligence actions against accountants on proof that "a primary intent of the client was for the professional services to benefit . . . the particular person bringing the action". 225 ILCS 450/30.1(2). See *Freeman, Freeman & Salzman, P.C. v. Lipper*, 2004 Ill. App. LEXIS 743 (1st Dist. June 23, 2004). On the extent to which Illinois is an *Ultramares* jurisdiction, see *Builders Bank v. Barry Finkel & Associates*, 339 Ill. App. 3d 1, 7-8, 790 N.E. 2d 30 (1st Dist. 2003), discussing *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, J.).) FDIC-Corporate points out that *FDIC v. Ernst & Young*, 967 F.2d 166, 171-72 (5th Cir. 1992), says in dictum that FDIC-Corporate "might be able to make this claim". It wants us to turn "might be able" into "is entitled".

*O'Melveny & Myers* held that claims by FDIC-Receiver depend on state law unless a federal statute provides otherwise. In *O'Melveny & Myers* FDIC-Receiver contended that it should be allowed to proceed under federal common law—if only the kind that incorporates most state law, see *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979)—because nothing in §1821 forbids that approach, and because bending some state-law rules would increase recoveries for the benefit of the insurance fund. That's the same line of argument that FDIC-Corporate makes to us: "let us proceed because nothing in §1821 explicitly forbids that step, and because if we win the insurance fund will be better off." But the *reason* FDIC-Corporate proposes this is to escape rules of state contract law that bind FDIC-Receiver. In other words, FDIC-Corporate in this suit (just like FDIC-Receiver in *O'Melveny & Myers*) wants to take advantage of state law's beneficial aspects while avoiding those it does not like—particularly rules enforcing waivers of punitive damages and agreements to arbitrate (which under the Federal Arbitration Act, 9 U.S.C. §2, must be enforced to the same extent as any other contractual promise).

*O'Melveny & Myers* observed that §1821 does override some state-law doctrines, but that efforts to evade additional ones through clever litigation tactics thus are not simply unprovided-for situations; permitting the maneuver would *contradict* the statutory resolution that federal law governs a few matters and state law the rest. 512 U.S. at 86-87. The Court added that even if §1821 were removed from the picture, it would be inappropriate to allow the FDIC to evade state law; "there is no federal policy that the [insurance] fund should always win." *Id.* at 88. Much of *O'Melveny & Myers*, including this passage, is addressed as pointedly to FDIC-Corporate as to FDIC-Receiver. Only by insisting that FDIC-Receiver pursue the failed bank's claims against third parties such as accountants and law firms can we ensure that all aspects of state law govern.

Still, we must consider the possibility that §1821(g)(1) authorizes this litigation indirectly. Following payment to a depositor from the insurance fund, FDIC-Corporate "shall be subrogated to all rights of the depositor against such institution or branch to the extent of such payment or assumption." Ernst & Young is not the "institution or branch" of which this statute speaks. Perhaps, however, an action against the failed bank could do service for an action against third parties. People who cannot sue directly often may sue derivatively: for example, a corporate shareholder unable to sue the firm's lawyers or accountants may be able to sue on behalf of the firm itself, if the board of directors unreasonably refuses or is financially aligned with the potential defendant. See *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991); *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333 (7th Cir. 1989); American Law Institute, *Principles of Corporate Governance: Analysis and Recommendations* Part 7 Ch. 1 (1994). As the collective representative of depositors (who after insolvency are equivalent to equity owners), FDIC-Corporate could demand that the failed bank pursue a

claim against responsible third parties and take over if a conflict of interest prevented the bank from acting to protect its investors. See *Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979); *Brandenburg v. Seidel*, 859 F.2d 1179, 1191 (4th Cir. 1988). But here the analogy to derivative litigation breaks down, because the manager of the failed bank's estate is FDIC-Receiver, which has no conflict. Illinois would not let FDIC-Corporate bypass "the management" (= FDIC-Receiver) just to avoid the terms of the bank's engagement letter with Ernst & Young. So the statutory subrogation route offers no prospect to FDIC-Corporate even when used as the fulcrum of a derivative claim. Everything points to FDIC-Receiver as the right entity to pursue any claim against Superior Bank's accountants.

Footnotes to the parties' briefs debate whether FDIC-Receiver can escape the arbitration clause and waiver of punitive damages by repudiating these provisions on the authority of 12 U.S.C. §1821(e). The district judge thought not, concluding that this subsection allows the repudiation of contracts as a whole but not unwelcome clauses in contracts. Otherwise FDIC-Receiver could walk away from the obligation to pay for goods and services that the bank had received before its failure. Or maybe the FDIC could claim a right to repudiate words (such as "not") or to repudiate the decimal point out of a figure (turning a borrower's promise to pay "10.9% interest" into "109% interest"). Cf. *Risser v. Thompson*, 930 F.2d 549 (7th Cir. 1991) (discussing the power of Wisconsin's governor to veto words out of sentences and letters out of words—subject to override, which the FDIC does not propose to afford Ernst & Young). Cherry picking is not allowed by the rejection power in bankruptcy, see *In re Crippin*, 877 F.2d 594 (7th Cir. 1989); why should it be permitted under §1821(e)? When denying reconsideration the judge recognized that, because FDIC-Receiver is not a party, the statement is dictum and that the subject remains open should FDIC-Receiver launch a

suit of its own. Likewise we avoid definitive resolution, though it is hard to escape the logic of the district judge's position. If the FDIC really thought that FDIC-Receiver could ignore these promises, then why did FDIC-Corporate pursue this litigation? It makes sense only if FDIC-Receiver is bound (because per *O'Melveny & Myers* it steps into the failed bank's shoes). The FDIC has not identified any appellate decision holding that §1821(e) may be used to excise words, sentences, or paragraphs from contracts. Still, until FDIC-Receiver has sued, and the subject has been fully briefed, it would be premature to resolve this question. We can say, however, that the district court has ample authority to award attorneys' fees against parties that make unjustified efforts to escape commitments to arbitrate, and that the validity of the waiver of punitive damages would be a subject for the arbitrator rather than the court. See, e.g., *PacifiCare Health Systems, Inc. v. Book*, 538 U.S. 401 (2003).

The judgment is modified to reflect a decision against FDIC-Corporate on the merits (rather than for lack of standing), and as so modified is affirmed.


A true Copy:

      Teste:


                _____

                *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*