In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-1244, 05-3500, 05-3642, 05-3651

JOHN W. COURTNEY, *et al.*,

*Plaintiffs-Appellants*, *Cross-Appellees*,

*v.*

NEAL T. HALLERAN, *et al.*,

*Defendants-Appellees*, *Cross-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 6926—**Joan B. Gottschall**, *Judge.*

ARGUED SEPTEMBER 25, 2006—DECIDED MAY 7, 2007

Before BAUER, KANNE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This case was brought by frus-
trated depositors of Superior Bank FSB ("Superior") in an
effort to recoup some of the money they lost when the
bank failed. A class of plaintiffs, represented by John W.
Courtney, Frances T. Lax, Lawrence M. Green, and Irene
Kortas, charged that the defendant bank's owners, officers,
directors, and accountants violated the federal Racketeer
Influenced and Corrupt Organizations Act (RICO), 18
U.S.C. §§ 1961 *et seq.*, the Illinois Consumer Fraud and
Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*
(CFA) and the Illinois Public Accounting Act, 225 ILCS
450/0.01 *et seq.*, through the actions they took while
Superior was going under. The district court dismissed the

RICO claims for lack of standing, and it dismissed without prejudice the supplemental state claims. It also initially dismissed a request for an injunction as unripe, but on reconsideration it denied the motion, finding that the requested relief would violate the prohibition in the banking laws on judicial interference with actions of the Federal Deposit Insurance Corporation. See 12 U.S.C. § 1821(j). Although the plaintiffs urge us to revive some or all of this litigation, we conclude that the district court resolved matters correctly, and we therefore affirm.

**I**

During the latter part of the 1980s, more than a thousand savings and loan associations in the United States failed. See "Savings and Loan Crisis," http:// en.wikipedia.org/wiki/Savings_and_Loan_crisis (visited April 24, 2007); Fed. Deposit Ins. Corp., "The S&L Crisis: A Chrono-Bibliography," http://www.fdic.gov/bank/ historical/s&l/ (FDIC Chronology) (visited April 24, 2007). The rate of failure was so great that the General Accounting Office[1] (GAO) declared the Federal Savings & Loan Insurance Corporation (FSLIC) fund insolvent by at least $3.8 billion in January 1987. See FDIC Chronology. During this crisis, the Federal Deposit Insurance Corporation (FDIC) had organized a program that permitted the consolidation of several failing or failed thrift organizations into one larger entity, which (the FDIC hoped) would enjoy greater economies of scale and which would be eligible for significant government assistance. See *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363,

---

[1] As a result of the GAO Human Capital Reform Act of 2004, Pub. L. 108-271, 118 Stat. 811 (2004), the name of the agency was changed to the Government Accountability Office. We refer to it here under the name it had at the time.

1366-67 (Fed. Cir. 2003). It dubbed this the "Phoenix program." See *id.* at 1366.

One of the institutions that failed was the Lyons (Illinois) Savings Bank, which went under in December 1988. Taking advantage of the Phoenix program, a group of investors including Penny Pritzker, Thomas Pritzker, and Alvin Dworman, through a holding company called Coast-to-Coast Financial Corporation (CCFC), acquired Lyons at the end of 1988. The group paid $42.5 million of its own money, and it received assistance from the FSLIC, which contributed a package of cash, tax credits, and loan guarantees worth $645 million. The Pritzkers (together) and Dworman each owned 50% of CCFC; CCFC in turn created a company called Superior Holdings, Inc., which was the nominal owner of the successor bank, Superior Bank FSB. As the district judge did, we refer to the owners as the CCFC defendants or group. The term "Bank defendants" refers to the officers and directors of Superior.

After the take-over, Superior began accumulating high-risk assets associated with retained interests in mortgage securitizations. Essentially, Superior would make a high-risk loan to an auto or home buyer with a poor credit history; it then pooled groups of these loans and sold the portfolios to investors. Superior then collected the income due from the underlying loans, and paid a fixed rate of return to the investors. This was capable of being a winning strategy as long as Superior correctly estimated the rate of default or prepayment of the underlying loans, and as long as it was not obligated to pay too high a fixed rate to its investors.

The plaintiffs were depositors of Superior. They claim that the CCFC group plundered Superior's assets by withdrawing excessive amounts of money from the bank and by engaging in self-interested transactions with it. For example, they charge that the CCFC principals

took out large loans from Superior that they had no intention of repaying, and that they drained Superior's assets by directing Superior to pay CCFC $188 million in dividends over the ten-year period from 1989 to 1999. Eventually, Superior was not able to withstand the alleged financial hemorrhage and it was forced to declare insolvency. (This is the second time that this court has been asked to consider aspects of that collapse. See *FDIC v. Ernst & Young LLP*, 374 F.3d 579 (7th Cir. 2004).)

According to plaintiffs, the CCFC group initially was able to conceal its misfeasance in several ways. First, its auditors, the accounting firm of Ernst & Young, allegedly cooperated in the cooking of Superior's books so that they reflected vastly inflated values for the bank's assets. Based on Ernst & Young's purported conclusions, the CCFC group and the Bank defendants made statements to depositors designed to assure them that Superior was financially sound. Plaintiffs also allege that the Bank defendants misrepresented the availability of FDIC insurance to existing and potential depositors. They charge that the Bank defendants told them that if they opened up multiple accounts in different names, then each account would be insured up to the maximum permitted by the FDIC. This was inaccurate, but, in reliance on this advice, the plaintiffs say that they were duped into depositing far more than the maximum that could be insured, just when Superior was about to fold.

By 1998, Superior's alleged mismanagement could no longer be ignored. The Office of Thrift Supervision (OTS) and the FDIC began to investigate, and they determined that several of Superior's audited financial statements significantly overstated the value of its assets. In January 2001, Ernst & Young conceded that its accounting treatment of Superior's retained interests was incorrect, and it agreed to re-evaluate its conclusions. That led to a write-down of Superior's retained interests first by $270 million,

and later by another $150 million. Insolvency followed soon thereafter; on July 27, 2001, the OTS appointed an FDIC receiver for Superior. The receiver transferred all insured deposits (that is, accounts that had up to $100,000 in them) to a new entity, Superior Federal, and it retained $49 million of uninsured deposits. As of the time the plaintiffs filed their lawsuit, Superior was still unable to refund those uninsured deposits.

The FDIC eventually settled Superior's claims against CCFC's principals for $460 million, of which $100 million was to be paid immediately and the remaining $360 million was to be paid over a 15-year period. Those monies are to be distributed in accordance with the federal statutory priority scheme, under which the plaintiff depositors will recover some, but not all, of their investments. See 12 U.S.C. § 1821(d)(11)(A). Plaintiffs are dissatisfied with the results of the settlement. They go further, in fact, and claim that the settlement itself violates the statute. They object to a feature under which the FDIC agreed with the CCFC group jointly to pursue the misrepresentation claims against Ernst & Young. If, and to the extent that, the FDIC prevailed in that suit, it agreed to assign the Pritzker/Dworman parties a percentage of its recovery. In the plaintiffs' view, this arrangement was a thinly disguised way of circumventing the statutory priority scheme and allowing the CCFC group to get more than its proper share.

Acting in its corporate capacity, the FDIC filed a lawsuit against Ernst & Young on November 2, 2002. The district court dismissed that action for lack of standing. This court affirmed on different grounds, finding that the FDIC in its corporate capacity ("FDIC-Corporate") had no claim against the accountants. Instead, we held, under 12 U.S.C. § 1821 the FDIC in its capacity as receiver ("FDIC-Receiver") is the correct plaintiff "to pursue any claim against Superior Bank's accountants." *FDIC v. Ernst &*

*Young LLP*, 374 F.3d at 583. No further actions the FDIC may have taken in any capacity are relevant to the present case.

## II

After an initial foray into state court, plaintiffs found themselves in federal court when the defendants removed the case. Successive rounds of pleadings culminated in a Fourth Amended Complaint, in which the plaintiffs asserted the following legal theories against the various defendants:

> Count I: Violations of the Illinois Consumer Fraud Act by the CCFC group, the Bank defendants, and Ernst & Young
>
> Count II: Violations of RICO, 18 U.S.C. § 1962(c), against CCFC and Ernst & Young
>
> Count III: Violation of the Illinois Public Accounting Act, § 30.1, against Ernst & Young
>
> Count IV: Aiding and abetting a violation of RICO, against Ernst & Young
>
> Count V: Action for injunctive relief and a declaratory judgment, against the Pritzkers, Dworman, and the FDIC, seeking declaratory and injunctive relief designed to enforce the plaintiff depositors' priority under 12 U.S.C. § 1821(d)(11)(A) over any assets recovered on behalf of Superior.

The district court dismissed the two RICO counts (II and IV) with prejudice, finding that plaintiffs lacked standing to sue; it initially rejected Count V as unripe, but later denied the requested declaratory and injunctive relief as precluded by 12 U.S.C. § 1821(j); and it dismissed the supplemental state claims in Counts I and III without

prejudice. After plaintiffs filed a notice of appeal from the denial of injunctive relief, this court briefly stayed the distribution of the Ernst & Young settlement proceeds to the shareholders of CCFC, but we dissolved the stay a week later. The district court entered its final judgment on July 27, 2005, and this appeal followed.

## III

### A

We begin with a discussion of Count V of the complaint, because that is the one that the plaintiffs have emphasized before this court. They claim, in brief, that the FDIC's agreement about the disposition of potential proceeds from its suit against Ernst & Young violates the mandatory distribution priorities established by the Financial Institutions Reform Recovery and Enforcement Act (FIRREA), Pub. L. 101-73, 103 Stat. 183, the pertinent part of which is codified at 12 U.S.C. § 1821(d)(11). They argue that a private party is entitled to an injunction against the FDIC when the agency fails properly to implement the distribution priorities of § 1821(d)(11), notwithstanding the anti-injunction provision of FIRREA, 12 U.S.C. § 1821(j). Finally, they argue that any amounts realized by the FDIC in its capacity as Superior's receiver are necessarily subject to the distribution priorities of § 1821(d)(11). They offer three arguments in support of their position: first, that the FIRREA priority scheme is functionally identical to priorities under the Bankruptcy Code, and thus bankruptcy cases requiring strict adherence to priorities dictate the outcome here as well; second, that the FDIC's authority as conservator or receiver to transfer assets without obtaining any special approval or consent under § 1821(d)(2)(G) is qualified by the priority scheme of § 1821(d)(11); and third, that funds recovered through litigation or settlement should be treated as

"amounts realized . . . [by] other resolution" under § 1821(d)(11)(A). The FDIC, the Pritzkers, and Dworman parry with several arguments: there is no private right of action to enforce § 1821(d)(11); section 1821(j) squarely precludes granting declaratory, injunctive, or other equitable relief where such relief would interfere with the receiver's management of the estate; and there is no violation of the § 1821(d)(11) priorities in any event.

We begin our evaluation of these claims with a look at the pertinent statutory language. Four parts of § 1821 are implicated, the key parts of which we set forth here for ease of reference:

### § 1821(d)(2)(G). Merger; transfer of assets and liabilities

(i) In general

The Corporation may, as conservator or receiver—

. . . **(II)** subject to clause (ii), transfer any asset or liability of the institution in default (including assets and liabilities associated with any trust business) without any approval, assignment, or consent with respect to such transfer. . . .

### § 1821(d)(11). Depositor preference

(A) In general

Subject to section 1815(e)(2)(C) of this title [relating to losses incurred by the FDIC], amounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority:

(i) Administrative expenses of the receiver.

(ii) Any deposit liability of the institution.

(iii) Any other general or senior liability of the institution (which is not a liability described in clause (iv) or (v)).

(iv) Any obligation subordinated to depositors or general creditors (which is not an obligation described in clause (v)).

(v) Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company). . . .

### § 1821(j). Limitation on court action

Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver. . . .

### § 1821(p)(3). Settlement of claims

Paragraphs (1) [prohibiting the sale of assets of a failed institution to certain persons] and (2) [forbidding debtors convicted of certain crimes from buying assets] shall not apply to the sale or transfer by the Corporation of any asset of any insured depository institution to any person if the sale or transfer of the asset resolves or settles, or is part of the resolution or settlement, of—

(A) 1 or more claims that have been, or could have been, asserted by the Corporation against the person; or

(B) obligations owed by the person to any insured depository institution, the FSLIC Resolution Fund, the Resolution Trust Corporation, or the Corporation.

Although the FDIC and the CCFC defendants would like us to sweep this claim away by finding that there is no private right of action to enforce the priority scheme established by § 1821(d)(11), we prefer not to take that approach. We are not compelled to consider this issue, because it relates only to the question whether the plaintiffs have stated a claim, not to the question of the district court's jurisdiction. The district court did not rule on it, and it is sufficiently complex, compare *Hindes v. FDIC*, 137 F.3d 148, 170 (3d Cir. 1998) (no private right of action under § 1821(d)(13)(E)), with *First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1127 (9th Cir. 2000) (finding private right of action under § 1821(d)(15) and acknowledging conflict with *Hindes*), that it should not be handled as some kind of after-thought. Furthermore, since we have concluded that plaintiffs' claims were properly dismissed, this would at most be an alternative ground for decision. We therefore save the question whether any kind of private right of action exists under § 1821 for another day. In addition, we express no opinion on the FDIC's alternative argument that plaintiffs' failure to exhaust administrative remedies is fatal to their claims. See 12 U.S.C. § 1821(d)(3)(13)(D); *Am. First Fed., Inc. v. Lake Forest Park, Inc.*, 198 F.3d 1259, 1265 (11th Cir. 1999); *Maher v. Harris Trust & Sav. Bank*, 75 F.3d 1182, 1190 (7th Cir. 1996). Recall that the district court had originally dismissed Count V as unripe; on reconsideration it relied exclusively on the bar against injunctive relief found in § 1821(j), to which we are about to turn. We see no reason why we should be compelled to consider exhaustion before § 1821(j), and thus we express no opinion on the plaintiffs' arguments that they have done enough to exhaust and that exhaustion does not apply under these circumstances.

The glaring problem with the plaintiffs' overall position on this part of the case lies in the anti-injunction language of § 1821(j). That section prohibits a court from taking any

action either to restrain or affect the FDIC's exercise of its powers as a receiver, unless authorization can be found elsewhere in the section. Far from finding such an authorization, however, we see nothing but language that reinforces § 1821(j). For example, § 1821(p)(3) permits the FDIC to sell or transfer assets as part of a settlement of claims that it could have asserted against someone. Section 1821(d)(2)(G)(i)(II) permits the FDIC to transfer assets or liabilities without any further approvals.

Other courts have recognized the breadth of § 1821(j)'s prohibition. The Ninth Circuit described the ban as an essential part of the FDIC's ability to function as a receiver. *Sahni v. Am. Diversified Partners*, 83 F.3d 1054, 1058 (9th Cir. 1996). The D.C. Circuit said that § 1821(j) "effect[s] a sweeping ouster of courts' power to grant equitable remedies to parties like the [plaintiffs]." *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995). Indeed, the court went on to make a point equally important to the case before us, in discussing whether the prohibition also reaches declaratory relief and other equitable relief:

> Not only does [§ 1821(j)] bar injunctive relief, but in the circumstances of the present case where appellants seek a declaratory judgment that would effectively 'restrain' the FDIC from foreclosing on their property, § 1821(j) deprives the court of power to grant that remedy as well. . . . For the same reason, § 1821(j) also bars the court from granting the [plaintiffs'] plea for rescission of the underlying transaction.

*Id.* See also *Tri-State Hotels, Inc. v. FDIC*, 79 F.3d 707, 715 (8th Cir. 1996) (reaching the same conclusion).

The plaintiffs try to avoid this significant obstacle to their suit by arguing that § 1821(j) cannot apply to actions of the FDIC that are *ultra vires*. First, they claim that the FDIC is rigidly bound to the priority structure set forth in § 1821(d)(11), just as a bankruptcy court is bound by the

priorities established by the Code. In *In re K-Mart Corp.*, we wrote that the general power conferred on a bankruptcy court by 11 U.S.C. § 105(a) "does not create discretion to set aside the Code's rules about priority and distribution; the power conferred by § 105(a) is one to implement rather than override." 359 F.3d 866, 871 (7th Cir. 2004). So too here, plaintiffs argue. But the plaintiffs conveniently ignore the fact that this court rejected the K-Mart plan because it did not meet the statutory requirements for the prioritization scheme it had selected and no other statute authorized the change in prioritization. *Id.* at 874. The problem was not that the court was powerless to allow a change in prioritization for *any* reason. *Id.* Here, the FDIC had specific statutory authorization for its actions. It has the power, under § 1821(d)(2)(G), to direct where funds should go. Bankruptcy law does not contain an analogous provision, and thus we do not find the plaintiffs' analogy to be particularly useful.

Plaintiffs object that § 1821(d)(2)(G) must be read in tandem with § 1821(d)(11)'s priority scheme. The FDIC's power to order transfers, they continue, may be exercised only if it observes the priority structure of the latter statute in designating the recipient. As support for their position, they cite only the district court's decision in *Adagio Investment Holding Ltd. v. FDIC*, 338 F. Supp. 2d 71 (D.D.C. 2004). Aside from the fact that *Adagio* deals with an entirely different situation—the sweep of funds from one set of insured accounts to another set of uninsured accounts, all within the same bank—it is of course not binding on this court. As we see it, plaintiffs are reading language into § 1821(d)(11) that is not there—essentially, they have equated transfers of existing assets with the disposition of amounts received upon "liquidation or other resolution" of an institution. In our view, § 1821(d)(11) cannot be read to limit the FDIC's

authority under § 1821(d)(2)(G)(i)(II) so significantly. In addition, we note that the FDIC promised in *Ernst & Young* to apply any recovery it obtains from the accounting firm in accordance with the statutory priorities. 374 F.3d at 582. It is not clear why plaintiffs regard that as insufficient to protect their interests, but the premise of this lawsuit is that more is needed for legal security. We therefore continue with our consideration of their arguments.

The next question is whether the part of the FDIC's potential recovery from Ernst & Young that is dedicated to the CCFC interests should be viewed as a future asset of the estate that must be liquidated in accordance with § 1821(d)(11), or if it is better conceptualized as something the estate never had at all. Plaintiffs argue that the fact that these (still-hypothetical) monies will pass through the FDIC's hands on the way to the recipients means that their disposition must be governed by federal law. They point to a decision of the U.S. Court of Federal Claims, *First Annapolis Bancorp., Inc. v. United States*, 54 Fed. Cl. 529 (Fed. Cl. 2002), in support of their position. Putting aside the facts that this decision, too, comes from a trial court whose rulings are nonprecedential and that ultimately the court rejected the FDIC's suit for lack of a case or controversy, *First Annapolis* does not help us resolve the question before us. We must decide what to do when damages are yet to be collected in the future, and if and when they are collected, they will simply flow through the FDIC's hands to the ultimate recipient.

Two reasons persuade us that the FDIC was entitled to structure its settlement with the CCFC parties in the way that it did. First is its general power to settle with alleged wrongdoers under § 1821(p)(3)(A), which must operate independently of § 1821(d)(11)(A) if it is to mean anything at all. We also note that both the FDIC, in its capacity as Superior's receiver, and the CCFC parties had independent

claims that they were entitled to assert against Ernst & Young. Had they never agreed to the settlement, there is no way that plaintiffs could have relied directly on FIRREA's provisions to get any part of a possible CCFC recovery. (We do not exclude other theories, but plaintiffs have asserted various other theories in the present lawsuit against the CCFC parties; the source of the funds that the defendants might use to satisfy plaintiffs' claims is presumably not a matter of great interest to them, as long as they know that enough money is there.)

We conclude, therefore, that the district court correctly rejected the plaintiffs' request in Count V for declaratory relief, injunctive relief, and other equitable relief.

B

The district court dismissed Counts II and IV, the two that are based on RICO, for lack of standing under the statute. The basic problem is not, however, standing, for the reasons we explained in *FDIC v. Ernst & Young*, 374 F.3d at 581-82. It is whether the depositors are entitled under RICO to bring a direct action against an insolvent bank's shareholders and accountants in a case like this, or if such a claim belongs exclusively to the FDIC at this point. FIRREA provides that "the [FDIC] shall, as conservator or receiver, and by operation of law, succeed to (i) all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, *account holder*, *depositor*, officer, or director of such institution with respect to the institution and assets of the institution." 12 U.S.C. § 1821(d)(2)(A) (emphasis added). Although this court has not spoken to the issue, both the Ninth and the Third Circuits have concluded that the depositors were not entitled to pursue their own RICO claim. *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1419-20 (9th Cir. 1995); *Popkin v. Jacoby (In re Sunrise Sec. Litig.)*,

916 F.2d 874, 880 (3d Cir. 1990). The *Hamid* court reasoned that, just as in the case of a shareholder derivative action, where the harm has been suffered by all depositors equally and plaintiffs have not suffered any distinct individual injury, the claim belongs to the institution (or its successor, the FDIC). 51 F.3d at 1419-20.

Although the plaintiffs urge that they meet that last criterion—injury unique to each person—they are talking about something different. Even if each depositor suffered different amounts of loss, the general misrepresentations alleged affected everyone in the same way. We have explained before that a "direct injury" for these purposes is an "injury independent of the firm's fate." *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1336 (7th Cir. 1989). Plaintiffs' injuries were entirely dependent on the bank's fate. The district court was therefore correct in substance to conclude that these plaintiffs were not the parties entitled by the statute to pursue any potential RICO claim.

C

Finally, both parties challenge the district court's resolution of the supplemental claims raised in Counts I and III. Plaintiffs would obviously like to see them restored, along with the federal claims they have asserted; defendants wish that the district court had retained them and resolved them favorably to defendants, instead of dismissing them without prejudice under 28 U.S.C. § 1367(c)(3). Because we have rejected the plaintiffs' federal claims, there is nothing more we need to add about the dismissal of their state claims. They are entitled, if they wish and are able to do so under state law, to pursue those matters in state court. Defendants believe that the district court's action was an abuse of discretion because banking law is heavily regulated at the federal level. In

those circumstances, they argue, there should be a greater presumption in favor of keeping the case in federal court even after claims that genuinely arise under federal law are gone.

That assumes, of course, that there is no original federal question jurisdiction over the state claims in Counts I and III. Defendants argue that this is wrong, and that we should find that federal law has entirely displaced state law in this area. This has become a popular argument of late, see *Bennett v. Southwest Airlines Co.*, 2007 WL 1215055 (7th Cir. Apr. 26, 2007), but in this case it is easy to reject it. The Supreme Court held in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996), that state banking laws are not preempted if they "do[ ] not prevent or significantly interfere with the national bank's exercise of its powers." *Id.* at 33. If state banking laws are not preempted, there is even less reason to think that federal banking laws preempt state laws of general applicability like the Illinois Consumer Fraud Act or the Public Accounting Act. Regulations issued by the Office of Thrift Supervision of the Department of the Treasury confirm that conclusion: "State laws of [contract and commercial law and tort law] are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations." 12 C.F.R. § 560.2(c).

To the extent that we are dealing with conflict preemption, this is one of the many areas in which the district court was entitled to conclude that the state courts would faithfully apply whatever federal laws and regulations may be implicated by this case.

## III

We have considered the other arguments that the parties have presented and find nothing that requires comment.

The judgment of the district court should be MODIFIED to reflect the fact that the RICO counts are dismissed on the merits, not for lack of standing; in all other respects, the judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*